IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOUNDEXCHANGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACCURADIO, LLC, <br><br> Defendant. | Case No. _____ |

**PLAINTIFF SOUNDEXCHANGE, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR ENTRY OF PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff SoundExchange, Inc. ("SoundExchange" or "Plaintiff") respectfully submits this Memorandum of Law in Support of its Motion for Entry of a Preliminary Injunction (the "Motion") (i) enjoining Defendant AccuRadio, LLC ("AccuRadio" or "Defendant") from engaging in wrongful conduct and continuing to deprive SoundExchange of statutorily required royalty payments; and/or (ii) providing SoundExchange reasonably adequate protection in the form of advance monthly payment on account of Defendant's estimated usage of the statutory licenses and digital transmissions of sound recordings. In further support of the Motion, SoundExchange states as follows:

**INTRODUCTION**

SoundExchange brought this action against AccuRadio after AccuRadio obtained a statutory license to digitally transmit copyrighted sound recordings over the internet, but then repeatedly failed and refused to pay federal statutorily-mandated royalty payments for its transmission of digital music and other performances over the internet pursuant to that license.

AccuRadio profits from streaming copyrighted sound recordings—its current business model depends on its use of a statutory license and payment of royalties to SoundExchange for distribution to artists and copyright owners. It is engaged in a pattern and practice of pocketing revenue from its dissemination of copyrighted works for its own financial gain, without making mandatory payments to SoundExchange for distribution to copyright owners and artists under the statutory scheme. AccuRadio first stopped making the required royalty payments under the statutory license in 2018, and has since incurred a debt in excess of $█████.

In good faith, SoundExchange entered into a forbearance agreement (the "Forbearance Agreement") with AccuRadio to give AccuRadio additional time to bring its delinquent balance current, provided that AccuRadio cease streaming copyrighted material without payment going forward, and stop its continued abuse of the statutory license. *See* **Exhibit A** – Declaration of B. Jackson at ¶ 12. AccuRadio nevertheless breached its obligations under both the Forbearance Agreement and federal law by again failing to pay royalties as and when due. Ex. A, ¶¶ 6 – 21. As of July 18, 2024, AccuRadio's continued use of the federal statutory license without paying for it, after execution of the Forbearance Agreement, has deprived SoundExchange from collecting in excess of $█████ for owners and creators of these copyrighted sound recordings for the transmissions occurring in the months of October 2023 through April 2024, in addition to the outstanding balance of $█████ for past due amounts under the forbearance agreement. Ex. A ¶ 20.

The statutory license is a boon to users—it allows them to stream copyrighted sound recordings without negotiating licenses individually from the multitude of copyright owners, but, in exchange for that statutory license, they are obligated to comply with their royalty obligations.

As AccuRadio persistently fails to abide by the statute's mandated royalty fees, it should no longer benefit from its use.

SoundExchange therefore seeks a preliminary injunction requiring AccuRadio to either: (1) pay advance monthly payments on account of AccuRadio's estimated usage of the statutory licenses; or (2) immediately cease using the statutory licenses. Without this injunctive relief, SoundExchange and the copyright owners of these sound recordings will continue to be irreparably harmed by AccuRadio. Ex. A ¶ 21. AccuRadio should not be permitted to benefit from using the statutory licenses while it refuses to abide by the rules governing them.

Given that it cannot be disputed that AccuRadio is not paying SoundExchange the royalties to which it is entitled, SoundExchange has a high likelihood of success on the merits, and absent the preliminary injunctive relief requested, it will suffer irreparable harm prior to a final resolution. There is no adequate remedy at law, as without preliminary injunctive relief, damages will continue to accrue. *Infra*, Section III(B)(3)(C). Not only will SoundExchange be impacted by these mounting damages, but so will the public at large, which consists of the aforementioned artists and copyright owners.

Should Defendant continue to deprive SoundExchange of both the statutorily-mandated royalty payments and accurate Reports of Use and Statements of Account, SoundExchange will continue to be unable to pay these artists and copyright owners the royalties to which they are entitled for AccuRadio's use of their sound recordings in violation of federal law. Accordingly, SoundExchange respectfully requests that this Motion be granted, and that the Court condition AccuRadio's continued use of the statutory licenses upon advance monthly payments to SoundExchange until a decision on the merits can be reached.

**FACTUAL BACKGROUND**

SoundExchange is the sole entity in the United States designated by the Library of Congress to collect digital performance royalties from statutory license users, and to distribute those royalties to performing artists and copyright owners. Complaint ("Compl.") ¶ 7.

Specifically, SoundExchange is charged by statute and regulation with administering the statutory license (*see, e.g.*, 17 U.S.C. § 114(g)(3)(A); 37 C.F.R. § 370.4), collecting statutory royalties (*see, e.g.*, 17 U.S.C. §§ 114(g)(2), (3); 37 C.F.R. § 380.7), and enforcing the terms of the statutory license (*see, e.g.*, 17 U.S.C. § 114(g)(3)(C)). Compl. ¶ 8.

Pursuant to this authority, SoundExchange collects statutory royalties from television music channels, satellite radio, internet webcasters, and other types of services for transmission of sound recordings, and distributes those royalties to performing artists and copyright owners. Compl. ¶ 9.

Defendant operates a multichannel internet radio service that provides access to over a thousand pre-developed music channels and access to millions of sound recordings. Compl. ¶ 10.

**A.    The Statutory and Regulatory Framework**

Section 106 of the Copyright Act grants the owner of a copyright in a sound recording the exclusive rights "to reproduce the copyrighted work in copies or phonorecords" and "to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. §§ 106(5)–(6), Compl. ¶ 11.

As an alternative to having every music service negotiate separate licenses with every copyright owner, Congress granted various eligible entities the ability to obtain a "statutory license." 17 U.S.C. §§ 112(e), 114(d)(2) ("license" or "statutory license" in the singular, and "licenses" or "statutory licenses" in the plural). Compl. ¶ 12. The statutory licenses allow these

eligible entities to render certain digital public performances of copyrighted sound recordings and make related reproductions. *Id*.

Per the Copyright Act, "[a]ny person who wishes to perform a sound recording publicly by means of a transmission eligible for statutory licensing under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording . . . by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection." 17 U.S.C. § 114(f)(3)(B)(i); *see also* Ex. A at Ex. 1.

The licenses, therefore, also allow eligible entities to comply with applicable requirements, including the payment of established royalties, to reproduce and publicly perform (via digital audio transmission) all commercial sound recordings without fear of copyright infringement. *See, e.g.*, 37 C.F.R. § 380.10, Compl ¶ 13. Effectively, the statutory licenses provide users a legal shield against claims by individual copyright owners.

"[R]easonable rates and terms of royalty payments" under the statutory license are set by the Copyright Royalty Judges in adversarial administrative proceedings that occur every five years. 17 U.S.C. §§ 112(e)(3), 114(f). The "rates and terms" set in proceedings before the Copyright Royalty Judges "distinguish the different types of digital audio transmission services then in operation." *Id.* § 114(f), Compl. ¶ 14.

In October 1998, Congress passed the Digital Millenium Copyright Act ("DMCA"), Pub. L. No. 105-304, 112 Stat. 2860 (Oct. 28, 1998), which amended Section 114 and other provisions of the Copyright Act. Among other things, the DMCA put in place a royalty rate standard for the sound recording statutory license. 17 U.S.C. §§ 114(j)(6), (8); Compl. ¶ 15. Services are classified

as either "eligible nonsubscription transmission" services or "new subscription service[s]," depending on whether they are provided to consumers at no charge or on a subscription basis. *Id.*

Licensees that utilize statutory licenses must provide SoundExchange with Reports of Use, monthly royalty payments and Statements of Account for their use of copyrighted sound recordings. *See, e.g.*, 37 C.F.R. §§ 380.2(b) & 380.3(a), Compl. ¶ 16. To the extent Licensees are late delivering a royalty payment, they must pay a fee of "1.5% (or the highest lawful rate, whichever is lower) of the late payment amount per month." For a late Statement of Account, Licensees must pay "1.5 percent of the payment amount associated with the Statement of Account." 37 C.F.R. § 380.2(d), Compl. ¶ 17.

Applicable regulations also grant SoundExchange the right to audit a Licensee's records to verify whether the Licensee has properly calculated the amount of the royalty payments. Compl. ¶ 18. Those audits may be conducted as often as annually and may cover any or all of the preceding three calendar years, however, any given calendar year may only be audited once. 37 C.F.R. § 380.6(b), Compl. ¶ 18. This audit is binding on all parties. 37 C.F.R. § 380.6(d). Additionally, if there is an underpayment of 10 percent or more, the Licensee must bear the audit's reasonable costs. 37 C.F.R. § 380.6(h), Compl. ¶ 18.

      **B.**      **AccuRadio's Failure to Make Payments to SoundExchange as Licensee.**

Until 2016, Defendant regularly provided the periodic Statements of Account, Reports of Use, and royalty payments required by the aforementioned statutory license, albeit sometimes untimely. Compl. ¶ 19, Ex. A ¶ 5. That changed in 2016, when Defendant's payments slowed and finally stopped in 2018. Compl. ¶ 20, Ex. A ¶ 6.

On or about February 25, 2020, the Parties entered into that certain Agreement for Payment Plan of Past Due Amounts (the "Payment Plan Agreement"). Compl. ¶ 21, Ex. A ¶ 7. A true and

correct copy of the Payment Plan Agreement was attached to Plaintiff's Complaint as **Exhibit A** and is incorporated herein by reference. Compl. Ex. A. Defendant failed to make required payments under the Payment Plan Agreement as and when due thereunder. Compl. ¶ 23, Ex. A ¶ 8.

Subsequently, SoundExchange performed an audit of Defendant's statutory royalty payments for the period of January 1, 2015–December 31, 2017, through which it identified additional royalties due to SoundExchange. Compl. ¶ 24, Ex. A ¶ 9.

### C. The Forbearance Agreement

On or about June 29, 2023, the Parties entered into the Forbearance Agreement, attached to Plaintiff's Complaint as **Exhibit B**. Compl. ¶ 25, Ex. B, Ex. A ¶ 12. As set forth in Recital F of the Forbearance Agreement, the Parties agreed that the total amount of $█████ was owed to SoundExchange as of May 31, 2021, on account of Defendant's failure to make royalty payments and pay other fees to SoundExchange as required under the statutory licenses, including, without limitation, underpayments discovered as a result of the aforementioned audit, and all late fees (the "Reconciled Amount"). Compl. ¶ 26, Ex. A ¶ 12.

The Forbearance Agreement set forth a down payment requirement and payment schedule for Defendant to satisfy the Reconciled Amount. Specifically, Section 3 of the Forbearance Agreement required that:

> "Commencing on June 30, 2023, and on the first day of each month thereafter for the duration of the Forbearance Period through and including April 1, 2027, AccuRadio will timely remit to SoundExchange (i) $█████ upon execution of this Agreement (the "**Initial Down Payment**"), and (ii) monthly payments as set forth on Schedule 1, attached hereto (i.e., totaling $█████ comprised of $█████ in aggregate monthly payments plus a single balloon payment of $█████ on April 1, 2027 at the conclusion of the Forbearance Period) (the "Forbearance Payments") [.]

Compl. ¶ 27, Ex. A ¶ 13.

In addition to timely remittance of Forbearance Payments, Defendant was also required under Section 7 of the Forbearance Agreement to timely pay SoundExchange all royalty payments and other charges required under the statutory licenses on a monthly basis, as such obligations thereafter became due (hereinafter, the "Royalty Payments"). Compl. ¶ 28, Ex. A ¶ 13.

Sections 7 and 11 of the Forbearance Agreement further provide, among other things, that Defendant's failure to fulfill its ongoing Royalty Payments following notice and expiration of the applicable cure period terminates the Forbearance Agreement and gives rise to SoundExchange's ability to exercise of all rights and remedies to collect from Defendant any and all outstanding Royalty Payments and the full balance of the outstanding Reconciled Amount. Compl. ¶ 29.

### D. Defendant's Default Under the Forbearance Agreement

Defendant paid the first three months of Royalty Payments that became due under the Forbearance Agreement and the statutory licenses for the months of June, July, and August 2023. Compl. ¶ 30, Ex. A ¶ 14. Starting with the September 2023 Royalty Payment, Defendant failed to make the required Royalty Payments when due. Compl. ¶ 30, Ex. A ¶ 15.

Royalty Payments and Statements of Account are due 45 days after the end of the month in which transmissions occur. Compl. ¶ 32. Therefore, as of December 13, 2023, Defendant's September 2023 payment became due. *Id.* On or about December 13, 2023, SoundExchange sent a letter to Defendant notifying it of Defendant's payment defaults under the Forbearance Agreement and statutory licenses, and demanding payment of all sums due and payable (the "Notice of Default"). Compl. ¶ 33, Ex. A ¶ 16. The Notice of Default is attached to Plaintiff's Complaint as **Exhibit C**. Compl. Ex. C.

Specifically, the Notice of Default demanded payment in full of all past due Royalty Payments, totaling $██████ as of December 13, 2023, comprised of the following amounts:

- 8 -

| | | |
|---|---|---|
| Past Due Ongoing Royalty Payments | $ | ███ [1] |
| Late Fees | $ | ███ |
| Total | $ | ███ |

Compl. ¶ 35, Ex. A ¶ 17.

After SoundExchange's service of the Notice of Default, Defendant failed to remit the required Royalty Payments within the 12 business day cure period afforded to Defendant under Sections 10(g) and 24 of the Forbearance Agreement. Compl. ¶ 36. Furthermore, Defendant failed to remit an additional $███ in Royalty Payments to SoundExchange as they became due for the periods of October 2023 through April 2024 as they became due from December 14, 2023 to July 18, 2024. Compl. ¶ 37, Ex. A ¶ 18. AccuRadio has also failed to identify and remit the amount of Royalty Payments it owes for the month of May 2024, which amounts become due on July 15, 2024, and include late fees accruing through July 18, 2024. *Id*.

As of July 18, 2024, Defendant owes a total of $███ to SoundExchange for overdue Royalty Payments, comprised of the following amounts, which do not include the May 2024 Royalty Payments that are now due:

| | | |
|---|---|---|
| Past Due Ongoing Royalty Payments | $ | ███ |
| Late Fees | $ | ███ |
| Total | $ | ███ |

Compl. ¶ 38, Ex. A ¶ 20.

These amounts, as well as the unliquidated amounts due for May 2024, continue to accrue statutory late fees as determined by regulation, and, unless preliminarily enjoined, additional Royalty Payments and other amounts due under the Forbearance Agreement and statutory licenses

---

[1] For transmissions made under the statutory licenses in September 2023, which became due on November 14, 2023. As of December 13, 2023, payments for transmissions made in October and November were not then due.

will continue to accrue from July 18, 2024, forward as Defendant continues to publicly stream sound recordings without making the required payments. Compl. ¶ 39, Ex. A ¶ 21.

### III.  ARGUMENT

#### A.  Legal Standard for Issuing a Preliminary Injunction

To determine whether a preliminary injunction is warranted, district courts engage in a two-step analysis. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) it has a reasonable likelihood of success on the merits; (2) absent preliminary injunctive relief, it will suffer irreparable harm prior to a final resolution; and (3) there is no adequate remedy at law. *Id.* "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F. 3d 537, 546 (7th Cir. 2010) (citing *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F. 3d 721, 725 (7th Cir. 2009)). The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely the movant is to win, the less the balance of harms must weigh in the movant's favor. *Ty, Inc. v. Jones Grp., Inc.*, 237 F. 3d 891, 895-96 (7th Cir. 2001).

#### B.  Plaintiff is Likely to Succeed on the Merits of Its Claims.

For purposes of the first requirement, SoundExchange need that "its claim has some likelihood of success on the merits[.]" *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). As demonstrated by the material presented with this Motion, SoundExchange's chance of prevailing on its underlying claims is close to certain.

1.  **Defendant Entered Into Valid, Enforceable, and Unambiguous Contracts with SoundExchange.**

SoundExchange has produced written agreements with AccuRadio. Compl. at Ex. A – B. The Payment Plan Agreement was signed on or about February 25, 2020, and the Forbearance Agreement was entered into on June 29, 2023. *Id.*; Compl. ¶¶ 21, 25, Ex. A ¶¶ 7, 12. There can be no credible dispute that these contracts exist and are binding and valid.

2.  **The Contracts are Unambiguous and May be Enforced by the Court.**

Once a contract exists, the Court may proceed to its interpretation. Under Delaware law—which governs the Forbearance Agreement[2]—the Court's primary goal in construing the contract is to give effect to the parties' intent as expressed in the terms of their written agreement. *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011). In Delaware, courts interpreting a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal citations omitted). Moreover, "[t]he contract must be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term mere surplusage." *Sunline Commer. Carriers, Inc. v. CITGO Petro. Corp.*, 206 A.3d 836, 838 (Del. 2019) (internal citations omitted).

In determining whether a contract may be construed or interpreted as a matter of law, the trial court should first determine if the pertinent contract language is ambiguous or unambiguous as a matter of law. *JFE Steel*, 797 F. Supp. 2d at 469. When a written contract is not ambiguous, the trial court should interpret the contract as a question of law and enforce it as written. *Id.*; *see*

---

[2] *See* Compl. Ex. B ¶ 23.

*also Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).

Here, the Forbearance Agreement is clear and unambiguous. In the Forbearance Agreement, Defendant "acknowledged that it failed to make royalty payments required under the Statutory Licenses on a regular basis since 2018 and owes certain late fees on royalty payments and Statements of Account from 2016 – 2018" and that "[AccuRadio] did not make the payments required" under the Payment Plan. Compl. Ex. B ¶¶ B – C, Ex. A ¶ 8. Further, AccuRadio acknowledged its past due obligations. Compl. Ex. B ¶ F, Ex. A ¶ 12. Defendant thus cannot meaningfully contest the amounts due in the Forbearance Agreement or its prior agreement to pay those amounts. Instead, Defendant's failure to fulfill the terms of the Forbearance Agreement represents a clear material breach of contract.

### 3. AccuRadio Breached the Forbearance Agreement.

Per the Forbearance Agreement, AccuRadio is required to remit monthly payments to SoundExchange as scheduled thereunder:

> "Commencing on June 30, 2023, and on the first day of each month thereafter for the duration of the Forbearance Period through and including April 1, 2027, AccuRadio will timely remit to SoundExchange (i) $_____ upon execution of this Agreement (the "**Initial Down Payment**"), and (ii) monthly payments as set forth on Schedule 1, attached hereto (i.e., totaling $_____ comprised of $_____ in aggregate monthly payments plus a single balloon payment of $_____ on April 1, 2027 at the conclusion of the Forbearance Period) (the "Forbearance Payments") [.]"

Compl. ¶ 27.

In addition to timely remittance of Forbearance Payments, AccuRadio is further required under Section 7 of the Forbearance Agreement to timely pay SoundExchange all Royalty Payments on a monthly basis, as such obligations became due. Compl. ¶ 28, Ex. A ¶ 13. Defendant paid the first three months of Royalty Payments that became due under the Forbearance Agreement and the

statutory licenses for the months of June, July, and August 2023. Thereafter, Defendant failed to make the required Royalty Payments as and when due. Compl. ¶ 30, Ex. A ¶ 15. AccuRadio therefore breached the terms of the Forbearance Agreement, and its breach continues.

### C. SoundExchange Will Suffer Irreparable Harm Absent Injunctive Relief.

In the Seventh Circuit, the second and third requirements for the issuance of injunctive relief tend to merge into one inquiry. *Mayflower v. Ann Arbor Warehouse*, 892 F. Supp. 1134, 1144 (S.D. Ind. 1995). The issue, as stated in *Mayflower*, becomes whether the plaintiff will be made whole should it ultimately prevail and receive money damages. *Id*. Here, even if SoundExchange is awarded damages for Defendant's past contractual breaches and statutory underpayments, AccuRadio's continued streaming of statutorily licensed recordings means it is continuing to accrue additional damages at an alarming rate. Ex. A ¶ 21.

Unless the Court orders AccuRadio to forfeit its statutory licenses and immediately cease transmitting, and/or require reasonably adequate protection in the form of an advance monthly deposit as requested herein, damages will continue to accumulate at a rapid rate. Ex. A ¶ 21. At a minimum, this Court should enjoin AccuRadio from using (or attempting to use or rely upon) the statutory license if it simply cannot comply with its payment obligations. Under these circumstances, AccuRadio should not be permitted to avail itself of the benefits conferred by the statutory licensing scheme. SoundExchange and the performing artists and copyright owners to whom it distributes royalties will continue to suffer immediate irreparable harm for which there is no adequate remedy at law until Defendant is enjoined from engaging in the foregoing wrongful conduct. Defendant continues to use the statutory license and attempts to avail itself of a legal defense to copyright infringement claims, while failing to pay statutorily-mandated royalties as and when they become due.

The Seventh Circuit has recognized that a defendant's potential inability to repay damages to a plaintiff at the conclusion of a suit may be considered irreparable harm by the Court. *Roland Machinery Co. v. Dressler Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (finding that monetary damages may be inadequate when a defendant may become insolvent before a final judgment can be entered and collected). As SoundExchange's and the recording artists' damages increase exponentially over time, AccuRadio's ability to make SoundExchange whole becomes more and more improbable. Ex. A ¶ 21. AccuRadio previously communicated that it did not have the necessary funds or revenue stream to bring its account current. Ex. A, ¶ 6. As a result, SoundExchange agreed to enter into the Payment Plan Agreement. Ex. A, ¶ 7. Even then, AccuRadio failed to make the required payments thereunder. Ex. A, ¶ 8.

Based on the foregoing and upon information and belief, Defendant will be unable to fulfill any monetary judgment against it awarded pursuant to Plaintiff's Complaint. Ex. A, ¶ 22. No remedy at law will make Plaintiff whole. Defendant continues to violate federal statutory regulations without intention to pay for the licensed works from which it benefits. SoundExchange is subject to irreparable harm by AccuRadio during the pendency of this suit since Defendant continues to transmit this material and enlarge SoundExchange's damages.

### D. The Balance of Harms Weighs in SoundExchange's Favor.

The final factor for the Court to consider is the balance of the harms—the irreparable harm AccuRadio will suffer if the injunction is enforced, weighed against the irreparable harm SoundExchange will suffer. *Ezell v. City of Chi.*, 651 F.3d 684, 694 (7th Cir. 2011). In making this final analysis, the Court is to give weight according to the likelihood of success demonstrated: the more likely it is that SoundExchange will succeed on the merits, the less the balance of irreparable harms need weigh toward its side; the less likely it is SoundExchange will succeed, the more the balance need weigh toward its side. *Ty, Inc.*, 237 F. 3d at 895. This process of "weighing" should

also take into consideration any potential consequences to the public interest in granting or denying preliminary relief. *Ezell*, 651 F.3d at 694. SoundExchange has shown extreme likelihood of success on the merits of its claims, and the Court should balance the factors accordingly.

Further, SoundExchange demonstrates that without injunctive relief, damages will continue to accrue. Ex. A ¶ 21. Not only will SoundExchange be impacted by these mounting damages, but so will the public at large, which includes the recording artists and copyright owners who rely on payment of royalties from SoundExchange for use of their works. Should Defendant continue to deprive SoundExchange of both the statutorily-mandated royalty payments and accurate Reports of Use and Statements of Account, SoundExchange will continue to be unable to accurately pay these artists and copyright owners for their works.

Additionally, the public has an interest in ensuring that contracts are enforced. *See, e.g., IDS Life Ins. Co. v. SunAmerica Secs., Inc.*, 958 F. Supp. 1258, 1282 (N.D. Ill. 1997) (partially vacated on other grounds) ("The public has no interest in destroying contracts . . . and encouraging unethical business behavior"). Accordingly, the balance of harms weighs heavily in Plaintiff's favor, and, as noted above, SoundExchange demonstrates high likelihood of success on the merits. SoundExchange thus respectfully asks the Court to grant injunctive relief as set forth in the accompanying motion.

E.     **The Court Should Waive Any Required Bond.**

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of the security bond is in the discretion of the Court. *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). The Seventh

Circuit has determined that a strong likelihood of success is a major factor which could weigh heavily in favor of waiving a bond requirement. *Id*. Similarly, a minimal bond can be set where the plaintiff is a "financially sound corporation" with "adequate financial resources." *See Turbo Tek Enters., Inc. v. F.P. Feature Prods., Inc.*, No. 87 C 7438, 1987 U.S. Dist. LEXIS 9466, at *51 (N.D. Ill. Oct. 6, 1987); Ex. A, ¶ 23. As discussed above, SoundExchange demonstrates a strong likelihood of success on the merits. Furthermore, any cognizable damages to AccuRadio (if any) associated with the adequate protection and advance deposit demanded herein would be minimal. This Court should therefore waive the bond requirement altogether, or, at most, set the bond at a *de minimis* amount which it deems to be appropriate.

## CONCLUSION

SoundExchange respectfully asks this Court to set this matter for a preliminary injunction hearing as soon as its docket permits; and upon completion of the hearing, enter a preliminary injunction (i) enjoining AccuRadio from engaging in wrongful conduct and continuing to deprive SoundExchange of statutorily required royalty payments; and/or (ii) providing SoundExchange reasonable adequate protection in the form of advance monthly payment on account of AccuRadio's estimated usage of the statutory licenses; and/or (iii) granting SoundExchange such other and further relief as deemed just and appropriate.

(*signatures on following page*)

Dated: July 19, 2024.　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　**THOMPSON HINE LLP**

　　　　　　　　　　　　　　　　　　　*/s/ Micah Fishman*
　　　　　　　　　　　　　　　　　　　Ryan Blackney
　　　　　　　　　　　　　　　　　　　Illinois Bar No. 6281642
　　　　　　　　　　　　　　　　　　　Micah Fishman
　　　　　　　　　　　　　　　　　　　Illinois Bar No. 6338965
　　　　　　　　　　　　　　　　　　　20 North Clark Street, Suite 3200
　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60602
　　　　　　　　　　　　　　　　　　　Telephone: 312-998-4240
　　　　　　　　　　　　　　　　　　　Facsimile: 312-998-4245
　　　　　　　　　　　　　　　　　　　*ryan.blackney@thompsonhine.com*
　　　　　　　　　　　　　　　　　　　*micah.fishman@thompsonhine.com*

　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　Sean A. Gordon
　　　　　　　　　　　　　　　　　　　*Pro Hac Vice* Motion Pending
　　　　　　　　　　　　　　　　　　　Two Alliance Center, Suite 1600
　　　　　　　　　　　　　　　　　　　3560 Lenox Road
　　　　　　　　　　　　　　　　　　　Atlanta, Georgia 30326
　　　　　　　　　　　　　　　　　　　Telephone:　404-541-2900
　　　　　　　　　　　　　　　　　　　Facsimile:　404-541-2905
　　　　　　　　　　　　　　　　　　　*sean.gordon@thompsonhine.com*

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff SoundExchange, Inc.*